**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JESSICA CRUNK, | ) | CASE NO. 1:13-CV-01829 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jessica Crunk ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to the consent of the parties entered under

the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the

Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On September 15, 2010, Plaintiff filed an application for POD and DIB, and on

March 23, 2011, she filed an application for SSI.  (Transcript ("Tr.") 11.)  In both

applications, she alleged a disability onset date of October 1, 2005.  (*Id.*)  Plaintiff's

applications were denied initially and upon reconsideration, and she requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On February 23, 2012, an ALJ

held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by

counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.
(*Id.*)  On May 24, 2012, the ALJ found Plaintiff not disabled.  (Tr. 8.)  On July 16, 2013,
the Appeals Council declined to review the ALJ's decision, and the ALJ's decision
became the Commissioner's final decision.  (Tr. 1.)

On August 20, 2013, Plaintiff filed her complaint to challenge the
Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in
this case.  (Doc. Nos. 16, 17.)

Plaintiff asserts the following assignments of error: (1) The ALJ's assessment of
Plaintiff's mental residual functional capacity is not supported by substantial evidence;
and (2) the ALJ erred in evaluating Plaintiff's symptoms, pain, and credibility.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in October 1975 and was 29-years-old on the alleged disability
onset date.  (Tr. 21.)  She had a limited education and was able to communicate in
English.  (*Id.*)  She had past relevant work as a fast food worker and deli clerk.  (*Id.*)

### B.   Medical Evidence

#### 1.   Physical Limitations

##### a.   Medical Reports

Plaintiff was involved in a motor vehicle accident in March 2011.  (Tr. 388.)  She
developed low back pain with bilateral radiculopathy.  (*Id.*)  An MRI of her lumbar spine
performed in January 2004 showed an 8-mm anterior sublaxation of L5 on S1 with
secondary degenerative disc disease.  (*Id.*)

2

On April 17, 2006, Plaintiff began treating with John Nickels, M.D., a pain management physician, for scoliosis, lumbar radiculopathy, degenerative disc disease, and a herniated disc. (Tr. 509-513.) Dr. Nickels saw Plaintiff every one-to-two months. Patient notes through January 30, 2008, revealed neck pain, low back pain, radiating pain down the right leg, and hip pain. (Tr. 491, 492, 497, 503, 505.)

In early February 2008, Plaintiff fell and injured her tail bone, resulting in right hip pain and low back pain. (Tr. 586.) X-rays showed bilateral pars defects at L5, minimal anterolisthesis of L5 over S1, disc bulging at L4/L5, and spondylolysis along with a grade one spondylolisthesis of L5 on S1. (Tr. 586, 588.) On February 28, 2008, Plaintiff presented to the emergency room with complaints of chronic back pain and reduced mobility. (Tr. 638.)

Plaintiff underwent a psychiatric pain management evaluation on March 4, 2008. (Tr. 633.) She complained of constant pain in the right low back and hip, intermittent sharp pain in the posterior neck that sometimes led to migraine headaches, and intermittent sharp abdominal pain in the left lower quadrant. (*Id.*) She reported that her recreational activities and work in the home were severely limited and that her mother-in-law did most of the household chores. (Tr. 634.) She stated that she spent three to four days per week in bed or otherwise reclined 18 hours per day. (*Id.*) Plaintiff reported two previous suicide attempts and substance abuse, including use of speed and cocaine. (Tr. 635.) She reported having problems with opiates since 2002 and having been arrested in 2005 for deception to obtain drugs. (*Id.*) It was recommended that Plaintiff participate in a chronic pain management program with chemical dependency treatment. (Tr. 636.)

3

On March 4, 2008, Plaintiff visited the emergency room with complaints of being out of her Percocet prescription and experiencing chronic low back pain and right hip pain.  (Tr. 626.)  Plaintiff's medication was refilled and she was referred to general internal medicine and pain management.  (Tr. 627.)  Plaintiff returned to the emergency room on March 23, 2008, due to an exacerbation of her chronic back pain.  (Tr. 580.)

On November 8, 2010, Gregory Collins, M.D., who had treated Plaintiff for drug addiction, opined that Plaintiff had the ability to lift and carry five pounds; she could stand/walk for a total of about two hours in an eight-hour workday; she was limited in her ability to sit and required a sit/stand option; and she could rarely climb, crouch, kneel, crawl, or handle.  (Tr. 774-775.)

A lumbar MRI was obtained on July 13, 2011, to evaluate Plaintiff's degenerative disease and spondylolysis.  (Tr. 957.)  The MRI showed grade 1 antrolisthesis at L5-S1 due to bilateral L5 spondylolyses, L5-S1 degenerative disk changes, bilateral L5-S1 foramina stenosis, and mild central disk protrusion at L4-L5.  (Tr. 958.)

Plaintiff received pain management treatment under the supervision of Edward Covington, M.D., from August 30, 2011, through September 15, 2011.  (Tr. 1071.)  Despite missing some appointments, Plaintiff met all of her treatment goals, and demonstrated a 90% improvement in functioning.  (Tr. 1040-1041.)  During her physical therapy sessions, Plaintiff indicated that she was not interested in working, but that she wanted to obtain her GED.  (Tr. 1037.)  Dr. Covington's final diagnoses included the following: somatization disorder; lumbago; spondylolisthesis; cervicalgia; migraine headache; abdominal pain; sacroiliac pain; urinary retention with incomplete bladder emptying; iliotibial band syndrome; lumbar spondylolysis; axis II disorder not otherwise

4

specified (NOS); depression and anxiety disorder; ADHD by history and opioid and benzodiazepine dependence in full sustained remission; and unexplained and unnecessary use of hypoglycemics.  (Tr. 1071.)  Plaintiff's condition on discharge was described as follows: "Pain was 1/10.  DASS [Depression Anxiety Stress Scales] depression score of 8 suggested no depression.  DASS anxiety score of 6 suggested no anxiety.  Pain Disability Index score of 4/70 suggested no functional impairment. Patient Global Impression of Change score was 2, indicating a self perception of being much improved."  (Tr. 1076.)

Plaintiff began treating with Colleen Clayton, M.D., in September 2011.  (Tr. 356.)  On November 23, 2011, Dr. Clayton completed a medical source statement regarding Plaintiff's physical capacity.  (Tr. 901.)  Dr. Clayton opined that Plaintiff could lift 25 pounds occasionally, and that her ability to stand, walk, and sit was not affected by her impairments.  (Tr. 901-902.)  Dr. Clayton also opined that Plaintiff could rarely climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, or push/pull.  (*Id.*) According to Dr. Clayton, Plaintiff should avoid moving machinery, chemicals, dust, and fumes.  (Tr. 902.)  She opined that Plaintiff would require extra rest breaks during an eight-hour workday as well as a sit/stand option.  (*Id.*)

On February 3, 2012, Dr. Clayton noted that Plaintiff had completed physical therapy in the fall of 2011 and had done quite well but had some lifting restrictions.  (Tr. 1094.)  Dr. Clayton noted that Plaintiff's bipolar disorder was well-controlled, that she was under the care of a psychiatrist, and that she was able to complete an exercise routine without difficulty.  (*Id.*)  On February 29, 2012, Dr. Clayton noted normal lumbar range of motion, a normal neurological examination, a normal gait, and a lack of

5

tenderness or abdominal pain.  (Tr. 1094.)  Dr. Clayton assessed Plaintiff with

spondylisthesis, with a good prognosis, noting that Plaintiff had done well with physical

therapy.  (*Id.*)  She advised Plaintiff to avoid heavy lifting and repetitive work.  (*Id.*)

### b.    Agency Reports

On September 27, 2011, Justine Magurno, M.D., examined Plaintiff at the

request of the Social Security Administration.  (Tr. 876-885.)  Dr. Magurno's impression

was diabetes with possible neuropathy, hypothyroidism, elevated cholesterol, vitamin D

deficiency, chronic constipation, chronic urinary retention, low back pain, hard of

hearing, weight loss, and asthma. (Tr. 880.)  Dr. Magurno opined that Plaintiff's

prognosis was poor, and that she should avoid dust, fumes, and other known lung

irritants, as well as heights, ladders, and dangerous machinery.  (*Id.*)  She also opined

that Plaintiff was markedly limited in her ability to bend, lift, and carry, and that she was

mildly limited in her ability to push, pull, stand, and walk.  (*Id.*)

### 2.    Mental Limitations

### a.    Medical Reports

Plaintiff was admitted to Mohave Mental Health Clinic on November 26, 2005,

through November 29, 2005, for methamphetamine dependence, polysubstance

dependence, and depressive disorder.  (Tr. 391.)  She reported that she was addicted

to meth, cocaine, and pain killers.  (Tr. 393.)  Carlos Pequeno, M.D., assessed

polysubstance dependence and a history of head trauma, and noted that Plaintiff was a

victim of childhood sexual abuse and was married to a man that was also addicted to

meth, cocaine, and pain killers.  (Tr. 394.)

On June 4, 2008, Plaintiff began Suboxone treatment with Dr. Collins for her opiate addiction and was referred to Recovery Resources for chemical dependency treatment.  (Tr. 607, 610.)  Plaintiff completed her chemical dependency program through Recovery Resources and elected to continue treatment with Dr. Collins.  (Tr. 667.)  On September 30, 2009, and October 28, 2009, Plaintiff complained to Dr. Collins about persistent anxiety.  (Tr. 681, 684.)  On December 23, 2009, Plaintiff reported that her anxiety was worse when she was out by herself.  (Tr. 691.)  She also noted that she felt "wonderful."  (*Id.*)  In April 2010, Plaintiff reported that she was sober and doing well, and the following month she reported that she was still sober and doing well but that her sleep was poor.  (Tr.  716.)  In July 2010, Plaintiff reported that she was doing well with no problems.  (*Id.*)

In June 2010, Plaintiff began mental health treatment for bipolar and anxiety disorders with agoraphobia at the Center for Families and Children.  (Tr. 843, 852-853.)  She participated in counseling on a weekly to biweekly basis throughout 2010 and 2011.

On July 28, 2010, Plaintiff saw Hayder Kadhim, M.D., a neurologist, for complaints of memory problems, forgetfulness, and an inability to focus and concentrate.  (Tr. 761.)  Dr. Kadhim concluded that Plaintiff did not have a real memory problem, but rather had poor concentration and focusing, which was part of pseudo-dementia related to her depression.  (Tr. 762.)  He advised Plaintiff to follow up with her psychiatrist.  (*Id.*)

On November 8, 2010, Dr. Collins completed a medical source statement regarding Plaintiff's mental capacity.  (Tr. 778-779.)  Dr. Collins opined that Plaintiff had

7

a "good" ability to: relate to co-workers; interact with supervisors; understand, remember, and carry out simple job instructions; maintain appearance; and relate predictably in social situations.  (*Id.*)  According to Dr. Collins, Plaintiff had a "fair" ability to follow work rules; use judgment; function independently without special supervision; understand, remember, and carry out detailed, but not complex, job instructions; socialize; and behave in an emotionally stable manner.  (*Id.*)  Dr. Collins opined that Plaintiff had a "poor" ability to: maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual with customary tolerance; deal with the public; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out complex job instructions; manage funds/schedules; and leave home on her own.  (*Id.*)  When asked to provide the medical/clinical findings that supported his assessment, Dr. Collins wrote that Plaintiff had irrational fears, anxiety, was distractible, and had ADHD.  (Tr. 779.)

A note from the Center for Families and Children dated October 25, 2011, reflects that Plaintiff reported an improvement in her anxiety and noted that she had felt much calmer.  (Tr. 888.)  Plaintiff's mother had confirmed that Plaintiff had been calmer and more focused.  (*Id.*)  Plaintiff stated that she "no longer had feelings of worthlessness" and had a desire to maintain progress.  (*Id.*)  In November 2011, Plaintiff reported that she had decided to leave her husband and that her depressive

8

symptoms "had not been bad lately."  (Tr. 889.)  Treatment notes indicate that she "did not express increased feelings of anxiety and stated that she was comfortable living in [a] new apartment with her mother and cat."  (*Id.*)

In February 2012, Dr. Collins opined that Plaintiff was "unemployable" due to marked limitations in the areas of understanding and memory, social interaction, and adaptation.  (Tr. 1090.)  Dr. Collins premised these limitations on Plaintiff's depression, anxiety, mood, poor memory, and reduced stress tolerance.  (Tr. 1091.)

On February 6, 2012, Michele McClure, LSW, Plaintiff's counselor at the Center for Families and Children, completed a medical source statement regarding Plaintiff's mental capacity.  (Tr. 1088-1089.)  Ms. McClure opined that Plaintiff had a poor ability to: follow work rules; use judgment; maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; deal with the public; function independently without special supervision; work in coordination with or in proximity to others without being unduly distracted or distracting; deal with work stresses; complete a normal work day and work week; understand, remember, and carry out complex and detailed job instructions; behave in an emotionally stable manner; relate predictably in social situations; manage funds or schedules; and leave home on her own.  (*Id.*)  Ms. McClure noted that Plaintiff had bipolar and anxiety disorders, an inability to concentrate for long periods or retain information, poor memory, extreme anxiety in social situations, an inability to leave her home, unaccompanied, and dependence upon her mother for care and appointment management.  (Tr. 1089.)

9

### b.    Agency Reports

Consultative examiner Mitchell Wax, Ph.D., evaluated Plaintiff on April 27, 2011.
(Tr. 823.)  During the examination, Plaintiff reported living with her three children, ages
18, 15, and 13, and having custody every other week.  (*Id.*)  She stated that depression,
anxiety, and obsessive-compulsive problems prevented her from working.  (*Id.*)  She
reported that she had been arrested twice for doctor shopping to obtain Vicodin and
Percocet.  (Tr. 824.)  She reported having no difficulty with supervisors or coworkers at
her previous jobs.  (*Id.*)  She last worked at a deli in 2005 but quit after two months
because she found the job to be too stressful.  (*Id.*) Dr. Wax described Plaintiff as "an
attractive emotionally labile woman who cried or laughed for no reason."  (*Id.*)  He noted
that there was no tendency for Plaintiff to exaggerate or minimize her symptoms.  (*Id.*)

Dr. Wax diagnosed bi-polar disorder with psychotic features.  (Tr. 828.)  He
concluded that Plaintiff's ability to relate to others was markedly impaired; her mental
ability to understand, remember, and follow instructions was moderately impaired; her
ability to maintain attention, concentration, and persistence was markedly impaired; and
her ability to withstand the stresses and pressures associated with day to day work
activity was markedly impaired.  (Tr. 827-828.)

Plaintiff underwent a consultative evaluation by Matthew Paris, Psy.D., on
September 27, 2011.  (Tr. 864-873.)  Dr. Paris diagnosed bipolar II disorder, most
recent episode depressed; posttraumatic stress disorder, chronic; learning disorder
NOS (per history); opioid dependence, in full remission; obsessive compulsive
personality disorder; and borderline personality traits.  (Tr. 871.)  Dr. Paris opined that

10

Plaintiff had some limitations in understanding, remembering, and carrying out instructions, but that she had the ability to perform simple tasks.  (Tr. 872-873.)  He also opined that Plaintiff had some limitations in her ability to maintain concentration and attention, as well as her ability to interact with others, due to her psychological symptoms.  (*Id.*)

## C.    Hearing Testimony

### 1.    Plaintiff's Hearing Testimony

Plaintiff lived with her mother in her mother's apartment.  (Tr. 38.)  She was divorced and had three teenage children who did not live with her. (Tr. 39.)  Plaintiff did not drive because she had been in several motor vehicle accidents and her family did not want her driving.  (Tr. 40.)  She had an eighth grade education.  (Tr. 41.)  She could read and write and could do basic addition and subtraction.  (Tr. 42.)  Plaintiff's mother helped her manage her food stamps.  (Tr. 43.)  She did not have friends but had some acquaintances that she saw on Wednesdays and Sundays at her church.  (Tr. 53.)

Plaintiff testified that when she was under a lot of stress, she would pull her hair out.  (Tr. 48.)  She experienced anxiety when she was around a lot of people.  (*Id.*)  She sometimes locked herself in her room with her cat for hours.  (Tr. 48-49.)  Plaintiff testified that she had been molested as a child by her father and stepbrother and that she had a lot of flashbacks of those events.  (Tr. 54. )

Plaintiff testified that she had pain in her back, hip, and in between her legs.  (Tr. 51.)  She also had difficulty urinating.  (*Id.*)

On a typical day, Plaintiff would wake up, read her prayer book, have breakfast,

11

attend doctor's appointments, watch TV with her mom or sister, and go to the YWCA with her mom.  (Tr. 56.)

### 2.  Vocational Expert's Hearing Testimony

Ted Macy, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of the same age, education, and work experience as Plaintiff who could perform a limited range of light work.  (Tr. 59.)  The individual could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could not perform work involving hazards such as unprotected heights or dangerous machinery; could frequently stoop, kneel, crouch, and crawl; would have to avoid concentrated exposure to irritants such as fumes, odors, dust, gasses, and poorly ventilated areas; could only perform simple, routine, repetitive tasks with no strict production quotas; could not perform work requiring negotiation, arbitration, or dispute resolution; could have occasional contact with the general public, coworkers, and supervisors; and would be off task five percent of the time.  (Tr. 59-60.)  The VE testified that the hypothetical individual could perform such jobs as a wire worker, an electronics worker, or a bench assembler.  (Tr. 60.)  The VE further testified that no jobs would be available for the hypothetical individual if the individual would be off task 20 percent of the time.  (*Id.*)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered

12

disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

13

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since January 29, 2009, the prior decision date.

3.    The claimant has the following severe impairments: degenerative disc disease, affective disorder, bipolar disorder, internal complete rectal prolapsed with intussusceptions of rectosigmoid.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations: The claimant could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs.  The claimant cannot perform work activity in proximity to unprotected heights or hazardous machinery.  The claimant can perform frequent stooping, kneeling, crouching, and crawling.  The claimant must avoid concentrated exposure to pulmonary irritants, including fumes, odors, dusts, gases, and poorly ventilated areas.  The claimant is limited to simple, routine, repetitive tasks that involve no strict production quotas.  The claimant cannot perform work requiring arbitration, confrontation, or resolution of disputes between parties.  The claimant is limited to occasional contact with the public, coworkers, and supervisors.  The claimant would be off-task up to five percent of the workday.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born in October 1975 and was 29-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.    The claimant has a limited education and is able to communicate in English.

9.    Transferability of job skills is not an issue in this case because the

claimant's past relevant work is unskilled.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2005, through the date of this decision.

(Tr. 14-23.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

15

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

> **B.      Plaintiff's Assignments of Error**
>
> > **1.      The ALJ's Assessment of Plaintiff's Mental Residual Functional Capacity is Not Supported by Substantial Evidence.**

Plaintiff argues that the ALJ's assessment of her mental residual functional capacity (RFC) is not supported by substantial evidence.  Specifically, Plaintiff maintains that the ALJ erred in concluding that there was evidence of improvement in her mental condition through 2011 following her divorce.  Plaintiff also argues that the ALJ erred in giving limited weight to the opinions of Ms. McClure, Dr. Collins, and Dr. Wax, and giving more weight to the opinion of consultative examiner Dr. Paris.  The Court will address each argument in turn.

> > **a.      The ALJ Erred in His Analysis of Plaintiff's Symptoms and Supposed Improvement in Her Condition.**

According to Plaintiff, the ALJ "engages in pure speculation, rather than review of medical evidence, when inferring that Ms. Crunk's symptoms were based upon her divorce and that there was improvement in these symptoms in 2011."  (Plaintiff's Brief ("Pl.'s Br.") at 13.)  Plaintiff maintains that substantial evidence does not support the ALJ's determination of Plaintiff's RFC, because there is evidence refuting the ALJ's findings that Plaintiff's mental condition in 2010 was situational and that there was gradual improvement in her condition in 2011.  According to Plaintiff, the ALJ erroneously chose to focus on certain portions of the evidence to fit his desired

16

conclusions.  For the following reasons, Plaintiff's argument is not well taken.

While it is true that the ALJ noted improvement in Plaintiff's mental health after her divorce in 2011, this conclusion is supported by evidence in the record.  The ALJ observed that Plaintiff's treatment records reflect that in 2011, her depression and anxiety decreased.  (Tr. 18, 859-862.)  For example, a note from the Center for Families and Children dated October 25, 2011, reflects that Plaintiff reported an improvement in her anxiety and noted that she had felt much calmer.  (Tr. 888.)  Plaintiff's mother had also confirmed that Plaintiff had been calmer and more focused.  (*Id.*)  Plaintiff reported that she "no longer had feelings of worthlessness," that she had improved her relationship with her children, and that she was "anxious to resume her physical activities at the YWCA."  (*Id.*)  She also indicated that she had a desire to maintain progress.  (*Id.*)  In September 2011, Dr. Covington described Plaintiff's condition on discharge from physical therapy as follows: "Pain was 1/10.  DASS [Depression Anxiety Stress Scales] depression score of 8 suggested no depression.  DASS anxiety score of 6 suggested no anxiety.  Pain Disability Index score of 4/70 suggested no functional impairment.  Patient Global Impression of Change score was 2, indicating a self perception of being much improved."  (Tr. 1076.)  In November 2011, Plaintiff reported that she had decided to leave her husband and that her depressive symptoms "had not been bad lately."  (Tr. 889.) Treatment notes indicate that Plaintiff "did not express increased feelings of anxiety and stated that she was comfortable living in [a] new apartment with her mother and cat."  (*Id.*)  Furthermore, as the ALJ noted in his decision, the medical evidence from 2011 shows no instances of delusions, hallucinations, suicidal ideation, or psychiatric hospitalizations.  (Tr. 18.)    Accordingly,

substantial evidence supports the ALJ's finding of an improvement in Plaintiff's condition in 2011, and the existence of conflicting evidence alone would not be an appropriate reason to reverse the ALJ's decision:  An ALJ's decision that is supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

Furthermore, Plaintiff purports to suggest that in determining Plaintiff's RFC, the ALJ focused solely on records showing an improvement in her condition in 2011 and ignored pertinent records and opinions supporting Plaintiff's claims regarding her mental limitations.  As Defendant correctly notes, however, the ALJ provided a detailed, well-reasoned decision articulating the rationale behind his RFC determination, and properly weighed and resolved the divergent aspects of the available evidence.  The ALJ specifically acknowledged that

> the objective psychological evidence supported the existence of some difficulties during this period that would limit [Plaintiff's] ability to perform stressful or complex work, or work that involved frequent change or interaction with others, but she would maintain the ability to perform simple, routine, repetitive, low-stress work that involved no more than occasional contact with others.

(Tr. 18.)  Thus, the ALJ did not, as Plaintiff contends, strategically select certain evidence from the record to support his conclusion that Plaintiff's condition improved in 2011, nor did the ALJ find that Plaintiff's mental health symptoms completely resolved after her divorce.  The ALJ limited Plaintiff to simple, routine, repetitive tasks that do not involve production quotas; no work requiring arbitration, confrontation, or resolution of disputes between parties; occasional contact with the public, coworkers, and supervisors; and work that would allow her to be off-task up to five percent of the

18

workday.  (Tr. 16.)  Therefore, even though the ALJ found that Plaintiff showed improvement in 2011, he nonetheless concluded, based on a review of the evidence as a whole, that Plaintiff had mental limitations that affected her ability to work.  The fact that the ALJ accounted for Plaintiff's mental limitations in his RFC determination indicates that his RFC was not based on the pure speculation that Plaintiff's mental condition was related solely to her prior marriage.

> **b.** **The ALJ Erred in the Weight Assigned to the Medical Sources of Record.**

Plaintiff argues that the ALJ erred in evaluating the medical opinions of record.  Specifically, Plaintiff maintains that the ALJ erred in giving limited to weight to the opinions of treating licensed social worker Ms. McClure, treating physician Dr. Collins, and consultative examiner Dr. Wax, while giving more weight to the opinion of consultative psychologist Dr. Paris.  The Court will address each opinion separately.

> **1.** **Ms. McClure**

In 2012, Ms. McClure, Plaintiff's counselor at the Center for Families and Children, completed a medical source statement regarding Plaintiff's mental capacity.  (Tr. 1088-1089.)  She opined that Plaintiff had a "poor"[1] level of functioning in most areas.  (*Id.*)  In his hearing decision, the ALJ referred to Ms. McClure as Plaintiff's "treating licensed social worker," and explicitly noted that even though Ms. McClure is not an "acceptable medical source" as defined by the regulations, he still considered her opinion to the extent that it was consistent with the treatment records and other

---

[1]     "Poor" was defined in the medical source statement as meaning that the claimant's ability to function is significantly limited.  (Tr. 1088.)

objective medical evidence. (Tr. 19-20.)  In assigning limited weight to Ms. McClure's

opinion, the ALJ explained:

> The undersigned finds that her opinion, that the claimant has
> "poor" functioning in all work-related areas, was not supported
> by the concurrent progress notes.  The record supports that Ms.
> McClure followed the claimant's progress from August 2011,
> during which time the claimant reported she was "doing well,"
> had been better about taking her medication on her own, she
> was able to go to the YWCA to exercise, her relationship with
> her children was improving, and that she "felt better in general."
> She reported an overall decrease in depressive symptoms and
> anxiety.  (Exhibits B21F, B24F).  Ms. McClure's own progress
> records reflected that the claimant was improving overall, and
> were generally inconsistent with her opinion that the claimant
> has poor functioning in almost each area on the pre-printed
> form.

(Tr. 20.)  Plaintiff argues that the ALJ "did not adequately consider Ms. McClure's

knowledge of Plaintiff's longitudinal treatment and the frequency of treatment when he

assigned her opinion little weight."  (Pl.'s Br. 17.)  Plaintiff's argument lacks merit.

Social Security Ruling 06-3p explains that opinions and other evidence from

medical sources who are not "acceptable medical sources," like licensed social

workers, are still relevant to the ALJ's determination of a claimant's RFC:

> Since there is a requirement to consider all relevant evidence in
> an individual's case record, the case record should reflect the
> consideration of opinions from medical sources who are not
> "acceptable medical sources" and from "non-medical sources"
> who have seen the claimant in their professional capacity.
> Although there is a distinction between what an adjudicator must
> consider and what the adjudicator must explain in the disability
> determination or decision, the adjudicator generally should
> explain the weight given to opinions from these "other sources,"
> or otherwise ensure that the discussion of the evidence in the
> determination or decision allows a claimant or subsequent
> reviewer to follow the adjudicator's reasoning, when such
> opinions may have an effect on the outcome of the case.

20

SSR 06-03P, *6 (S.S.A Aug. 9, 2006).  Furthermore, Social Security Ruling 06-3p

provides that when evaluating opinion evidence from medical sources who are not

"acceptable medical sources," certain factors should be considered,[2] such as:

> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

Id. at *4-5.

Here, the ALJ explicitly acknowledged Ms. McClure's treatment relationship with

Plaintiff and explained why he rejected her opinion that Plaintiff had poor functioning in

all work-related areas.  (Tr. 19-20.)  As a result, this Court is able to determine that the

ALJ at least considered the relevant evidence from Ms. McClure in assessing Plaintiff's

RFC, but rejected it due to its inconsistency with Ms. McClure's own progress records.

Because Ms. McClure, a social worker, is not an "acceptable medical source," the ALJ

had no burden to provide good reasons for rejecting her opinion or further elaborate

upon his decision to assign the opinion little weight.  Accordingly, with respect to Ms.

McClure, the ALJ did not err.

### 2.  Dr. Collins

The ALJ found that Dr. Collins was one of Plaintiff's treating physicians.  "An ALJ

---

[2]    Not every factor for weighing evidence will apply in every case.  SSR 06-03P, *5 (S.S.A. Aug. 9, 2006).

must give the opinion of a treating source controlling weight if he finds the opinion
'well-supported by medically acceptable clinical and laboratory diagnostic techniques'
and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v.
Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §
404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may
be given little weight if it is unsupported by sufficient clinical findings and is inconsistent
with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).
If an ALJ decides to give a treating source's opinion less than controlling weight, he
must give "good reasons" for doing so that are sufficiently specific to make clear to any
subsequent reviewers the weight given to the treating physician's opinion and the
reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL
374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by
the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and
its purpose is to "let claimants understand the disposition of their cases" and to allow for
"meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation
marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating
physician's opinion less than controlling weight, the error is not harmless and the
appropriate remedy is remand.  *Id.*

On November 8, 2010, Dr. Collins rendered a mental residual functional capacity
assessment finding that Plaintiff has a poor ability to: maintain attention and
concentration; respond appropriately to changes; maintain regular attendance and be
punctual; deal with the public; work in coordination with or proximity to others; deal with

work stress; complete a normal work day and work week; understand, remember, and carry out complex job instructions; manage funds and schedules; and leave home on her own.  (Tr. 778-779.)  On February 2, 2012, Dr. Collins opined that Plaintiff had marked limitations in: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual with customary tolerances; sustaining an ordinary routine without special supervision; working in coordination or in proximity to others; making simple work-related decisions; completing a normal work day and work week; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; getting along with coworkers and peers; being aware of normal hazards; traveling alone in unfamiliar places or using public transportation; and setting realistic goals or making plans independent of others.  (Tr. 1090.)  Dr. Collins concluded that Plaintiff was unemployable based on the aforementioned limitations.  (*Id.*)

The ALJ assigned "limited weight" to Dr. Collins' opinions, noting that "the corresponding treatment evidence and objective medical findings did not support this degree of limitations, especially at the time of his assessment in February 2012."  (Tr. 19.)  If this were all the ALJ had said about the evidence, the case would require remand.[3]  In this case, however, the ALJ's opinion, taken as a whole, thoroughly

---

[3]      There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for rejecting it requires remand.  *See Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend*

evaluates the evidence and indicates the weight the ALJ gave it.  This provides a

sufficient basis for the ALJ's rejection of Dr. Collins' opinions, *see Nelson v. Comm'r of*

*Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006), and affords this Court the

opportunity to meaningfully review the ALJ's opinion.  In *Nelson*, the ALJ failed to

discuss the opinions of two of the plaintiff's treating physicians, and the plaintiff argued

that this failure constituted a basis for remand.  The Sixth Circuit disagreed, concluding

that "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly attacks both

the supportability of [the treating physicians'] opinions and the consistency of those

opinions with the rest of the record evidence."  195 F. App'x at 470.  Because the ALJ's

discussion of the other evidence "implicitly provided sufficient reasons for not giving . . .

controlling weight" to the treating physicians, the Sixth Circuit concluded that the ALJ's

decision satisfied the purposes of the controlling physician rule.  *Id.* at 472.

In this case, the ALJ provided a lengthy discussion of the medical evidence

before evaluating the opinions of the treating physician and the other medical opinions

contained in Plaintiff's record.  (Tr. 17-21.)  The ALJ's discussion of the medical

evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather, the

ALJ analyzed the medical evidence and explained how it supported his ultimate RFC

determination.  (*Id.*)  For example, the ALJ discussed the following evidence, which

implicitly rejects Dr. Collins' opinions regarding Plaintiff's mental limitations:

---

*v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put
simply, it is not enough to dismiss the treating physician's opinion as
incompatible with other evidence of record; there must be some effort to
identify the specific discrepancies and to explain why it is the treating
physician's conclusion that gets the short end of the stick.").

24

• The ALJ found that Plaintiff had mild restrictions in her activities of daily living.  (Tr. 15.)  She reported no difficulty doing household duties during her marriage and reported that she cleaned her home extensively.  (*Id.*)  The ALJ noted that "[w]hile there is some evidence of decreased functioning in relation to the time of her divorce, that has not been sustained throughout the entire relevant period."  (*Id.*)  The ALJ further observed that counseling records in mid and late 2011 showed that Plaintiff's overall symptoms improved significantly after her divorce was final.  (*Id.*)

• The ALJ found that Plaintiff had moderate difficulties with regard to social functioning.  (Tr. 15.)  He explained that there was some evidence of social isolation, but Plaintiff did not report a history of interpersonal problems in her past employment, and despite her limitations, she could still leave her home to go to medical appointments, church, the grocery store, and the gym.  (*Id.*)

• The ALJ concluded that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace.  (Tr. 16.)  He observed that Plaintiff's most recent consultative examination revealed that she had "some" limitations in maintaining concentration and attention, and a state agency psychological consultant found that she had moderate limitations in that area.  (*Id.*)

• The ALJ noted that Plaintiff had no history of psychiatric hospitalizations during the relevant period.  (Tr. 16.)

• Plaintiff had a history of prescription medical substance abuse, which the ALJ found undermined her credibility with regard to the severity of her mental health symptoms.  (Tr. 18.)

• The ALJ observed that treatment records reflected that Plaintiff's mental health symptoms gradually improved throughout 2011 after her divorce, and there was no evidence of delusions, hallucinations, suicidal ideation, or psychiatric hospitalization.  (Tr. 18.)

Had the ALJ discussed the aforementioned evidence immediately after stating that he was assigning only limited weight to Dr. Collins' opinions, there would be no question that the ALJ provided "good reasons" for giving Dr. Collins' opinions less than controlling weight.  The fact that the ALJ did not analyze the medical evidence for a second time (or refer to his previous analysis) when rejecting Dr. Collins' opinions does

25

not necessitate remand of Plaintiff's case.  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).  Accordingly, the ALJ did not err with regard to Dr. Collins.

### 3.    Dr. Wax and Dr. Paris

In April 2011, consultative examiner Dr. Wax completed a disability assessment report in which he opined that Plaintiff had marked limitations in all work-related mental functional areas and a Global Assessment of Functioning (GAF) score of 41,[4] indicating serious functional limitations.  (Tr. 827-828.)  The ALJ gave Dr. Wax's opinion limited weight, noting that it was based on Plaintiff's one-time presentation and was not consistent with the concurrent counseling records from the Center for Families and Children, which revealed steady improvement in Plaintiff's anxiety and depression symptoms throughout 2011.  (Tr. 20.)  Plaintiff argues that the ALJ erred in assigning limited weight to Dr. Wax's opinion, because the opinion is "perfectly consistent with the

---

[4]    The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

totality of the evidence. . . ."  (Pl.'s Br. 19.)

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Because Dr. Wax was a consultative examiner, the ALJ was required only to acknowledge that his opinion contradicted the ALJ's RFC finding, and explain why he did not include Dr. Wax's assessed limitations in his determination of Plaintiff's RFC.  A review of the ALJ's decision indicates that the ALJ adequately explained why he chose to give only limited weight to Dr. Wax's opinion.  (Tr. 20.)  According to the ALJ, Dr. Wax's finding of marked limitations in all work-related mental functional areas and a GAF score of 41 was inconsistent with concurrent counseling records.  (*Id.*)  Indeed, records from the Center for Families and Children show that Plaintiff's condition began

27

to improve in 2011, and, as the ALJ explicitly acknowledged, there was no medical evidence of delusions, hallucinations, suicidal ideation, or psychiatric hospitalizations during that year.  (Tr. 18.)   In October 2011, Plaintiff reported that her anxiety had improved and she felt much calmer, she was able to focus better and had been able to concentrate enough to read the Bible, and she was no longer having feelings of worthlessness.  (Tr. 888.)  In November 2011, she reported that her depressive symptoms "had not been bad lately," and her mood was positive and calm.  (Tr. 889.)  Accordingly, evidence supports the ALJ's decision to assign limited weight to Dr. Wax's opinion due to its inconsistency with concurrent treatment records.

Furthermore, the ALJ did not err in assigning "more weight" to consultative psychologist Dr. Paris' September 2011 opinion that Plaintiff had some limitations in: understanding, remembering, and carrying out instructions; performing simple tasks; maintaining concentration and attention; and interacting with others.  (Tr. 20.)  The ALJ found that opinion to be "consistent with the claimant's history of some social anxiety and difficulty with concentration."  (*Id.*)  Plaintiff purports to argue that the ALJ erred in giving limited weight to Dr. Wax, a consultative examiner, while giving more weight to Dr. Paris, also a consultative examiner, when Dr. Wax's opinion was more specific than Dr. Paris's opinion.  This argument has no merit, as Plaintiff's disagreement with how the ALJ weighed and resolved the medical opinion evidence is not a valid basis for reversing the ALJ's decision.  *See Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be

28

warranted even if substantial evidence would support the opposite conclusion.")[5]  For

the foregoing reasons, Plaintiff's first assignment of error does not present a basis for

remand of her case.

### 2. The ALJ Erred in Evaluating Plaintiff's Symptoms, Pain, and Credibility.

Plaintiff argues that the ALJ erred in failing to give adequate consideration to her

credible complaints regarding her combined physical and mental impairments.

Credibility determinations regarding a claimant's subjective complaints rest with the

ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See*

*Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal*

*v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the

ALJ's credibility determinations must be reasonable and based on evidence from the

record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver*

*v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also

must provide an adequate explanation for his credibility determination.  "It is not

---

[5]     Plaintiff also argues that the ALJ erred by failing to address Dr. Paris'
finding that Plaintiff had a GAF score of 45, which Plaintiff maintains is
"consistent with a finding of disability."  (Pl.'s Br. 20.)  Plaintiff is mistaken
on this point.  A GAF score, alone, is not dispositive of an individual's
functional abilities, particularly when substantial evidence show that the
claimant functions at a level greater than the GAF score suggests.  *See*
*Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002) ("While
a GAF score may be of considerable help to the ALJ in formulating the
RFC, it is not essential to the RFC's accuracy."); *Kornecky v. Comm'r of*
*Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir.2006) ("If other substantial
evidence (such as the extent of the claimant's daily activities) supports the
conclusion that [a claimant] is not disabled, the court may not disturb the
denial of benefits to a claimant whose GAF score is as low as [the
claimant's] or even lower.").

Case: 1:13-cv-01829-NAV  Doc #: 18  Filed:  06/10/14  30 of 33.  PageID #: 1311

sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

When a claimant complains of disabling pain, the Commissioner must apply a two-step test known as the "Duncan Test" to determine the credibility of such complaints.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain.  *Id.* Second, if there is such an underlying medical condition, the Commissioner must examine whether the objective medical evidence confirms the alleged severity of pain, or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain.  *Id.* In making this determination, the ALJ must consider all of the relevant evidence, including six different factors.[6]  *See Felisky,* 35 F.3d at 1039–40 (citing 20 C.F.R. §

---

[6] These factors include the following:
> (1) the claimant's daily activities;
> (2) the location, duration, frequency, and intensity of the claimant's alleged pain;
> (3) precipitating and aggravating factors;
> (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;
> (5)  treatments  other  than  medication  that  the  claimant  has  received  to

404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may

satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman*

*v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per

curiam).

Here, a review of the ALJ's decision reveals that the ALJ discussed most, if not

all, of the relevant factors in his assessment of Plaintiff's physical and mental condition.

(Tr. 15-21.)  The ALJ examined Plaintiff's daily activities, her treatments and her

responses to those treatments, the clinical examination findings, and the physician

statements of record.  (*Id.*)  Thus, the ALJ considered the relevant evidence.

Moreover, in assessing Plaintiff's mental limitations, the ALJ determined that

Plaintiff's statements concerning the intensity, persistence, and limiting effects of her

alleged symptoms were not credible to the extent that they were inconsistent with the

ALJ's RFC assessment.  (Tr. 17.)  Thus, the ALJ did not reject Plaintiff's subjective

complaints altogether; rather, he determined that his RFC assessment adequately

accounted for Plaintiff's limitations based on a careful consideration of the evidence.  In

finding that Plaintiff was capable of performing a limited range of light work despite her

mental limitations, the ALJ discussed the following evidence:

> • Plaintiff was moderately limited with regard to social functioning.  (Tr.
> 15.)  She did not report a history of interpersonal problems in her past
> employment, and although she has a history of abuse that has caused

---

relieve the pain; and
(6) any measures that the claimant takes to relieve his pain.

some anxiety being around others and there was some evidence of social isolation, despite those limitations "the claimant can leave her home to go to medical appointments, church, the grocery store, and the gym. The claimant was able to interact appropriately at medical appointments." (*Id.*) Furthermore, the ALJ gave significant weight to the findings of the state agency psychological consultant who found that she had moderate limitations in the area of social functioning due to her impairments, finding the opinion "consistent with the records of the claimant's persistent social anxiety around large groups of people." (*Id.*)

• Plaintiff has experienced no episodes of decompensation. (Tr. 16.) While she has a remote history of psychiatric hospitalization for a suicide attempt, no such episodes took place during the relevant period. (*Id.*)

• The ALJ considered Plaintiff's testimony regarding her mental health condition, noting: "She testified that she has flashbacks to past traumatic events, and often isolates herself in her room. She is anxious around others, especially men. The claimant reported that she experiences a great deal of anxiety around groups of people, even family members. She alleged that she does not leave her house on her own, and requires her mother's assistance and close supervision for virtually all daily activities." (Tr. 17.)

• The ALJ explained his reasoning for finding that, regarding Plaintiff's mental health symptoms, the objective medical evidence and treatment records do not support the extent and severity of Plaintiff's allegations: "Prior to the period in question, the claimant had a history of prescription medication substance abuse, which the claimant reports is in remission. She receives continued Suboxone treatment to manage her addiction. The prior Administrative Law Judge noted that the claimant's providers recognized that she engaged in 'doctor shopping,' which undermined her credibility with regard to the severity of her mental health symptoms." (Tr. 18.)

• The ALJ acknowledged that Plaintiff's mental health symptoms persisted beyond her past substance abuse, but explained that the evidence does not support that her symptoms preclude all work activity. (Tr. 18.)

Thus, the ALJ specifically compared Plaintiff's alleged mental health symptoms to other evidence in the record and found that Plaintiff's subjective complaints were

inconsistent with the objective evidence.  This inconsistency is an appropriate basis for an adverse credibility finding.  *See Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility . . . is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.")  Furthermore, the ALJ's recognition that Plaintiff had abused prescription medication in the past and had engaged in "doctor shopping" on more than one occasion is also a proper basis for finding her to be less than fully credible.  The ALJ adequately conducted a proper pain and credibility analysis, and Plaintiff's second assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: June 10, 2014

33